Colcock, J.
In this case it is clear, that that clause under which the sheriff acted, is not now in force. The county court act being repealed, of course the clause relating to county sheriffs is also repealed ; -and that by discharging the prisoner, he made himself liable for -the debt. It is not necessary to decide in this case, the question so much discussed, about the'Costs. Had the prisoner been discharged by the operation of law, it would then have been a question, who should pay the costs. I am, therefore, for the motion.
BREVARD, J.
This is a motion on the part of the plaintiff for a new trial. The action was trespass on the case, against the defendant as sheriff of the district of York, for the voluntary escape of J. Gallagher, who was in his custody, by virtue of a surrender of his special bail, on mesne process, at the suit of the plaintiff. The trial was in the Court of Common Pleas for York district, before Judge Waties, who charged the jury in the defendant’s favor, for whom the verdict was found. The evidence was, that the pris-pner was discharged from his confinement, being in the sheriff’s custody, as already dlated, on the ground that he was unable to pay for his sustenance in prison, and that the plaintiff had refused to pay for the same, or give security to do so. The sheriff, it appeared had been induced to discharge the prisoner, from a belief that a clause in the county act of 1785, which relates to this subject, see P.:L. 880, was in force, from seeing it inserted in a late republication, as still in force. I am of opinion, there ought to be a new ■trial on the ground of misdirection. The clause of the county court act relied upon, is not in force. It never was in force as a general. law ; and the abolition of the county court system has totally repealed it. It is only necessary to enquire what the law was, on the point in question, prior to the American revolution ; and whether it has undergone any change, in consequence of our change of government, or has been altered by statute law. What the law was in England prior to our revolution, is laid down in Plowden’s Commentaries, 60, 66, and Co. Litt. 47, in terms to be sure, so harsh as to savor of inhumanity ; yet it is believed, not many instances have occurred of debtors being starved to death by their creditors.
The charity of society is found to be an unfailing resource against individual .cruelty and oppression. I speak in general terms. It *293 must be confessed that it is not always so ; but it is not within the reach of human wisdom, and human policy, to provide effectually for every possible case. The same law which was established in the mother country, was adopted in the colonies. In this country, the common law of England was expressly made of force, by an act of assembly,.passed in 171á. The exceptions, specified in that statute, do not in any wise affect the law upon the point in question. P. L. 99.
There is nothing in the local position of this country which necessarily requires a different law. • There is nothing in the change which has taken place in theJorm'of our government, and political relations, which seem to have operated a necessary change in the law. We may regret that the law is so ; but it is not for the judiciary to usurp legislative powers, and alter and amend the law, as may be thought proper or necessary. Tf this court had the power to remedy the grievance complained of in this case, I should doubt of the policy and propriety of adopting any other law, than that which appears to me settled, in relation to the subject under consideration. It would be difficult, I conceive, to form any system which would eschew the evils now complained of, without exposing .society to others equally mischievous, and, perhaps, involving greater practical distress.
As to the sheriff, I have such an opinion of the charity and liberality of those who compose the mass of society in this country, and of their means of affording succor and relief to the distressed, that I am persuaded he can never be a great sufferer, either in his property or his feelings, from being reduced to the necessity of supporting all insolvent prisoners, or seeing them starve to death. If the real situation of a prisoner, reduced to such an extremity, should be made known, it would not be long, ere the necessary relief would be afforded by the charity of the community. My opinion is, that the defendant, as sheriff, was bound to keep his prisoner in safe custody within his gaol; and that he was not-bound to supply him with food unless he was paid for it. That the discharge of the prisoner, under the pretence that he was unable to pay for his sustenance, or otherwise procure it; aná because the creditor had refused to.pay for the food necessary to his existence in prison, or to give security to do so, was illegal, and rendered the sheriff liable to the action for a voluntary escape. It may be a hard case as relates to the sheriff, but not more so, than if an irresistable mob had broken the prison, and set the prisoner at liberty; or he had escaped from the insufficiency of the gaol: *294 yet’ in these cases, the sheriff would be liable. See 2 Wils. 294. 4 T. R. 789. 4 Co. 84. Bull. N. P. 60.
Bay, J.
By the common law, the plaintiff in an action, is not kouud t0 maintain a defendant imprisoned at his suit for debt: he is obliged to maintain and support himself, or his friends may do it if they think proper; and if he is unable to do so, or if he has no friends who will make the necessary advances for him, then he must have recourse to the common charity of mankind; and if they are so unfeeling as to refuse to assist him, he is left to perish in confinement. But whatever his situation may be, or however deplorable his condition, the sheriff has no authority to set him at liberty: and'if he does, he makes himself responsible for the debt.
This doctrine of the common law may, at the first blush, appear hard and unreasonable; yet if a contrary principle was once established, there would be no effectual check to knavery and imposition, where men are obstinate and stubborn, and prefer confine, merit to a surrender of their propérty to their creditors ; and sad experience has taught us that there are many of this description in all countries, who would, if the law would permit it, prefer living on the bounty of their creditors, in indolence, to their coming out of gaol, upon giving up their property in payment and satisfaction of just demands against them. So far with regard to the common law on this subject. Let us now see whether any, and what, alterations have been made, by any, and which of our statutes.
The 39th clause of the pounty court act, did make a provision of this kind, for debtors imprisoned by process out of those courts. It expressly declares, that if any person should be taken on exe. tion, or other process, and should not be able to give bail, pay the money, or have any land, goods, or chattels, whereby his mainte. nance in gaol could be defrayed, the plaintiff in the action, or per-, son at whose suit such defendant should be imprisoned, should pay and satisfy the same; and if such person, or his attorney, should refuse, on notice, to pay the same, or give security to pay the same on demand, then such prisoner should be freed and discharged from his confinement. This clause, however, in the county court act, related only to suits in those courts, and to prisoners confined in gaol on executions, or other legal process issuing from them, and not from any of the other courts in this State. Admitting, however, that it might have been doubtful, whether it extended to the other courts of justice or not; yet as the act i® now repealed* this provision ceased with it.
*295 The next regulation in our statutes, upon the subject, is the 12th clause of the insolvent debtors act, which authorizes the court from whence1 the process issues at the request of the creditors, to commit the person applying for the benefit of that act, for twelve months, in cases of rendering in a false schedule, or concealing his estate or effects from such creditors ; provided that the creditors requesting such commitment, shall during the said term, pay the provost marshal or gaoler, six shillings and three pence per diem, for the sub. sistence. of such prisoner; and in case the creditor or creditors shall neglect to pay the same, for the space of'one week, th'en the provost marshal shall immediately discharge such person or persons from custody.
This latter regulation most evidently applies to persons praying for the'benefit of the insolvent act; and those only who have been imprisoned on suspicion of fraud, or concealment of their effects, or rendering in a false schedule on oath; and can have no bearing or application to prisoners committed on mesne process. These, I believe, are the only clauses in any of our acts of assembly, which in any'degree relate to the point now under consideration, one of which is now repealed, and the other is confined to the particular case specially mentioned in the act, but which will by no means justify the sheriff in discharging the defendant out of his custody, under the existing circumstances of the case.
In order to remove every ground of hardship in this, or similar cases, I have only to observe, that in no part of the world, is the law more favorable to unfortunate debtors, than in South Carolina. The prison bounds act gives an easy and convenient relief from confinement within the four walls of a prison ; and the insolvent debtors act, affords an equally easy and effectual discharge from the debt entirely, to honest and unfortunate debtors, on giving up their estate and effects to their creditors. So that obstinate men have themselves to blame, if they are retained in confinement beyond that reasonable time allowed by law, for them to apply to the courts of -justice for a legal discharge. It is, therefore, my"opinion, that the sheriff has clearly made himself liable by this discharge, and that there should be a new trial.
Nott, J.
In this case, two questions are submitted to the consideration of the court: 1. Whether a person putting a man in gaol on mesne process, or ca. sa., is bound to maintain him there? 2. If he is, and fail to do so, whether the sheriff is liable for an escape, if he discharge him ?
In the first place, I shall endeavor to shew that according to the *296 pr¡nc¡p[es 0f the common law, a person is bound to maintain his!, prisoner in gaol; and, secondly, if the common law is held to be otherwise in England, it never has been, and never ought to be the ^aw ®tate ’ anlb ^srdly, if it ever was recognized in this State, it has since been altered by several acts of the legislature.
With regard to the first point, I would premise, that I disclaim any right in this court to legislate, or to alter, or disregard any established principle of law. And I have as high a veneration for the true and genuine principles of the common law, as any member of the bench ; but I believe it is as much the privilege and the duty of this court, as of the Court of King’s Bench, or Common Pleas, to decide what the common law is. It is true, that many times the sources of the common law are dark and hidden, and therefore, our judgments must be guided by the best lights we can obtain* • And-when we find any principle, agreed upon by the English elementary writers, and recognized by aseries of uniform decisions, we usually do, and perhaps always ought to adopt their decisions, as the highest evidence of what the common law is, on the subjects to which they relate. But we are not bound to pay that respect to the antiquated opinions of any one judge, nor the loose extrajudicial opinions of several, however respectable they may be. Secondly, Where the principles of law, on which the judges in England have founded any opinion, are equally visible to us, I think-we are authorized to draw our own conclusions from those principles, and are not bound by their decisions.
Let us now examine the authorities relied on, to prove that a-person is not bound to maintain a man whom he has put in gaol.-The only case produced is Dive v. Manningham, 1 Plowden, 68,. where Chief Justice Montague says,-“a gaoler is not bound to find a prisoner meat, but he must live of his own, and if be has no goods of his own, he shall live by the charity of others, and .if others will give him nothing, let him die in the name of God.” Now, admitting the law to have been at that time, as laid down by O. J. Montague, the harsh, unfeeling manner in which it is pronounced, shows the barbarous state of the times in which he lived, and would at least raise a doubt, whether it ought to be adopted in a more civilized state of society. Chief Justice Pratt, in the case of Wilks, says, that in the case of the seven Bishops, 4 State Trials, 302, there was but one honest man, out of the four who then composed the-Court of the King’s Bench ; and that the opinion ought not to be regarded, on. account of the “ dark, insensible state of '‘justice in those days.” And if such was the state of things at that *297 tithe, I presume they could not have been more enlightened in the time of Chief Justice Montague. Blit whatever might have been . the state of justice, his own words afford abundant proof of the dark, insensible state of his mind. And if that was a good reason why the judges in England should not be governed by a decision of thejr own court, it is surely a good one, why this court should not bb. And it is farther to be observed, that this was a mere die-turn of Judge Montague, in an answer to the arguments of counsel, and, not a deliberate opinion, on a point involved in the case then before the court.
The cases cited by Plowden, in support of this opinion, as far as 1 have been able to look into them, do not embrace the question. Most of them relate to the impounding of cattle, in which case it is said the owner is bound to feed them, and not the person by whom they are impounded. But I presume it will not be pretended at this day,, that there is such an analogy between the impounding of an ox, and the imprisonment of a naan, that if one may be permitted to starve in a pound, the other may ,in a gaol; and much less to conclude, that because the owner is bound to feed the one, nobody is bound to feed the other. But even in the case of impounded cattle, if they are put in a close pound, the impounded is bound to feed them.
It is also to be observed, that at common law, a creditor was not allowed a ca. sa. against the body of his dehtor, 3 Coke, 11, 12, 2 Bacon, 351, c. Dalton’s Shff. 138, 144, and the arrest of a person on mesne process, is by statute. And I believe that none of those statutes make any provision for the payment of costs. The opinion, then, that neither the plaintiff nor sheriff are bound to feed a prisoner while in gaol, is only an inference drawn from the silence of the statutes on the subject. It therefore becomes the duty of this court, to form its own opihion, and not to adopt implicitly the opinions of the English judges. The question then is, whether such an opinion is supported by the general principles of the corn-mon law, or can be collected from analogous Cases ? f think not. From those sources, Iehould draw conclusions directly the reverse. It is a general rule, that the party creating costs shall pay them. The plaintiff is, in the first instance, always liable for the costs of suit. If he levy a fi. fa. on negroes, and put them in gaol for safe keeping, he must pay for their support, until they are sold. If he take cattle, he must do the same. Why then if he take the body of the'defendant, should not the same liability attach? Surely it cannot be merely because Chief Justice Montague once said he *298 Was not bound to do so, I admit there are other cases that favor this opinion. But as no other has been relied on by the counsel for the plaintiff, I shall not notice any other, farther than to observe that as far as they have come within my observation, they are all j00ge ex(ra.jucjicial opinions, thrown out by way of argument, and all appear bottomed on this solitary dictum, in the case of Dive v. Manningham. I find no case,, where the doctrine has been directly decided, and loose opinions thrown out in this manner, however respectable the authors from whom they came, are not entitled to the force of law. On the other hand, Lord Coke says, a gaoler cannot refuse a prisoner victuals, and ought not to suffer him to die for want of sustenance. Co. Lit. 295, a. 9 Coke’s Rep. 87. This opinion of Lord Coke, is given deliberately, as a settled rule of law, and not hastily thrown out arguendo. And although it relates to criminals, and not to persons confined on civil process, yet it is equally opposed to the opinion of Judge Montague, who extends the rule to all descriptions of prisoners ; and if it is a correct rule of the common law, that the State should maintain its prison, ers, it would seem that the same rule ought to apply to individuals. In Butler’s notes, Co. Litt. 289, a case is reported, where a man confined on a civil process, was released from gaol by order of the court, on account of old age and infirmity. It would be an extraordinary display of humanity, to discharge a person from gaol to save his life, who was brought to the brink of the grave by old age, and let one in full youth and vigor, imprisoned for the same offence, lie and starve. And if it was the duty of the judges in one case, to release the prisoner to save his life, it is difficult to discover upon what principle it would be their duty to refuse it in the other. It is laid down by Dalton, 122, “ that if a man be in execution, on a statute merchant, he must be found in prison, out of the rents and revenues of his land which are in execution, viz. the creditor out of the rents and revenues of his land, is to find him bread and water, the which costs notwithstanding, the debtor must recompense the creditor again with his debt, before the debtor be let out of gaol.” This case, it appears to me, places the subject on its true ground. The creditor is bound to pay the gaoler his debtor’s expenses while in confinement, but he has a claim upon ¿im for repayment, and may keep him in gaol until he is satisfied. I will mention one other case, which I do not think of light authority. Doctor Johnson, in his life of Savage, says, “ he took care to enter his name according to the form of the court, that the creditor might be obliged to make him some allowance if he was continued a prisoner.” He *299 says further, that Savage afterwards informed him, that on account of the resentment of the city, some of the merchants intended to pay the allowance which the law required, and detain him a prisoner at their own expense. Whether it was by the common law, or by any particular statute that he had this claim for his expenses, does not appear ; but it at least affords an argument in favor of the correctness of the principle. An insolvent debtor in England, is entitled to a certain weekly allowance for his support, and that must be paid by the plaintiff. In the case of Savage, it does not appear that he applied for the benefit of the statute ; neither was he to be supported by the plaintiff, but by strangers to the action. From whence it may be inferred, that he did not rely on the statutes for the relief of insolvent debtors; and if there is another statute making such provision, I have not found it. I conclude, therefore, that it is a common law right, regulated by rule of court.
2. But let us admit, that by the ancient common law, a plaintiff was not bound to maintain his prisoner in gaol, I feel authorized to say it is part of the common law, which never has, and never ought to become a part of the law of this State. It is said we are bound by the common law, and that to deviate from it would be to make law, and not expound it. But although we are bound by the common law, we are not bound by every decision of the English courts ; and the act making the common law of force in this State, excepts suqh parts of it as are inconsistent with the particular constitutions, customs, and laws of the State. Act of 1712, P. L. 99. The eminent Judge Waties, who tried this case, afTd who was a distinguished member of this court for more than twenty years, decided that if such was the common law of England, it had never been acted upon in this State, and that it was contrary to the humane principles of our constitution, qnd I concur with him most heartily. And although we are not authorized to break down, or disregard the great landmarks of property, and personal liberty, which have been established by wisdom, and consecrated by the experience of ages, yet the act. makes it our duty to exercise a liberal discretion in moulding the ancient rules of the common law to the principles of justice, and the enlightened principles of our free government. And if this rule of the common law has never yet been, acted upon, I am not disposed now to make a precedent. Mr. Cooper says, “ 1 consider all law, of whatever kind, as deduced either from extensive and long adopted usage furnishing presumptive evidence of general experience, or from reasoning founded on the nature of human society, and pointing out the conclusions best adapted to gene* *300 ral experience.” Cooper’s Just. 405. Every country must have a common law of its own, and in the pursuit of the principles of natural justice, when we have no constitutional provisions on the su^íecti we have a right to explore every source. Many of the principles of our decisions are drawn from the civil law, and are confessedly contrary to the decisions of the English courts. And on the question now under consideration, we find that'by the law of the twelve tables, although creditors had a right to cut their in. solvent debtors in pieces, yet while they kept them in confinement, they were bound to feed them ; and even cutting them in pieces, is more humane than suffering them to starve.
I believe it will not be denied, that from the first establishment of the government, it has been usual for the State to maintain criminals in gaol; and if this indulgence, has been given to the vilest criminals, surely less kindness ought not to be shewn to unfortunate debtors, and others, who have only committed civil injuries. This practice of the State, grew out of a state of society and government, which rendered such a barbarous principle, if it ever did prevail in England, inapplicable here, and it is satisfactory to my mind, that the legislature has always considered it contrary to the principles of our constitution, customs and laws.
3. But if any doubts still remain, they ought to be removed by a reference to the several acts of the Assembly, relating to the sub. ject. By the act of 1759, commonly called the insolvent debtor’s act, it is enacted, sec. 20, that the creditor or creditors, at whose suit any persSn shaM be arrested, ana’ imprisoned, who shall be ad. milled to the benefit of the said act, shall be, and are hereby made liable for, and chargeable with the fees due to the provost marshal, on account of the arrest and imprisonment of such person. As this act relates altogether to insolvent debtors, it may be argued that it is only persons taking the benefit of the acl, who are entitled to this provision. But I do not conceive the act as introducing any new principle, yet it may serve to confirm or explain an old one. This clause has two objects in view, first, to declare who shall be liable for the fees under this act, and secondly, to declare who shall not be liable, and who might, perhaps, have been considered so, were it not for.this clause. It provides that the creditor, if there is but one at whose suit he is imprisoned, shall be liable for the fees, but if there are more than one, that they shall all be equally liable. This was necessary, lest the demand should be made, which was made under the British act, for a full allowance from each plaintiff. It was necessary to show that the other suing creditors, although *301 entitled- to a dividend of the estate, are not liable for the fees of the gaoler. Indeed, it appears to be the object of th6 act throughout, to make the persons who create fees, liable to pay them. For the 13th section, which provides for ilie recommitment of a prisoner, who has committed a fraud in surrendering up his property, expressly provides that the creditor requesting a recommitment, shall pay for his subsistence. The person or persons by whom he was originally imprisoned, are exempted, and the whole liability falls upon the person who has caused him to be recommitted. It can hardly be supposed thai the legislature would be so careful to provide for a creditor who had been guilty of a fraud, by which he forfeited all claim to mercy, while persons were unprovided for, who, however honest they might be, were not entitled to the benefit of that act. But the acts of 1785, P. L. 380, goes still further ; it declares in totidem verbis, “that if a person confined in gaol, has no lands, tenements, &c., whereby his maintenance in gaol can be defrayed, the plaintiff or person at whose instance such person shall be imprisoned, shall pay and satisfy the same.”
In answer to this, it may be said, that this is a clause of the county court act, and, therefore, relates only to those courts, and that the act is now repealed. To the first 1 would observe, that many of the clauses of the county court act were intended, and have always been considered as having a general operation. Of this description, are those parts-of the act relating to bails the jurisdiction of magistrates, the recording of deeds, and several others. This clause is in very general words : it says, “ where any person shall be taken in execution, or other process, and from inability to pay the debt and damages, or find bail, in any civil action, if committed to gaol, &c., the plaintiff shall pay for his support.” It is not restricted to the county courts. And if the legislature did not intend it to extend to the superior courts, it must have been because such was the practice in those courts before. It is difficult to believe that-so important a privilege should depend upon the court from which the process issued. And this opinion is strengthened by a reference to another clause in the same act, P. L. 377, where a similar provision is made expressly to indemnify the sheriff of the county. And I cannot conceive why the two clauses were introduced, unless one was intended for the observance of the county courts, and the other to have a general operation, which the phraseology of the two clauses would seem to imply. With regard to the second objection, to wit, that the county court act is now repealed, it will be sufficient to reply that only such parts of it are repealed, as *302 are repugnant to the present circuit court act, and there is nothing in this clause repugnant to that act. Another question made in this case is, whether admitting the plaintiff to be liable, the sheriff was authorized to discharge him on the ground that the money was not paid, or security given for it. But as a majority of the court are of the opinion that the plaintiff is not liable, it is unnecessary to give an opinion on that point.
Motion refused.